**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kimberly Isom, | No. CV-12-02649-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| JDA Software Incorporated, | |
| Defendant. | |

Pending before the Court are Defendant's Motion for Summary Judgment (Doc. 90) and Plaintiff's Motion to Strike Defendants' Response to Plaintiff's Supplemental Statement of Facts and Attached Exhibits (Docs. 104 & 104-1) (Doc. 105). The Court now rules on the motions.

## I. Motion to Strike

After Plaintiff filed her controverting and supplemental statements of facts (Doc. 96), Defendant filed a Response to Plaintiff's Supplemental Statement of Facts along with attached exhibits. (Doc. 104). Plaintiff moves to strike this document as improperly filed in violation of the Local Rules of Civil Procedure ("Local Rules"). (Doc. 105 at 1). The Local Rules do not permit a party moving for summary judgment to file a separate response to the non-moving party's statement of facts. *Kinnally v. Rogers Corp.*, 2008 WL 5272870, at *2 (D. Ariz. Dec. 12, 2008).

Defendant nonetheless objects to the striking of its filing on the basis that it could not possibly address all of Plaintiff's 118 supplemental statements of facts in its reply

brief. (Doc. 108 at 3). Defendant apparently miscomprehends the standard for deciding a motion for summary judgment, in which the movant bears the burden of proving "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Explicating the logical possibilities for a supplemental statement of facts demonstrates why Defendant's argument must fail. Each of Plaintiff's supplemental facts necessarily must fall into one of the following categories: (1) not material to deciding the motion, (2) material to deciding the motion and disputed, or (3) material to deciding the motion and undisputed. A movant is not prejudiced by not responding to facts falling into the first category because a court does not consider immaterial facts in ruling on a motion for summary judgment. *See Quanta Indem. Co. v. Amberwood Dev. Inc.*, 2014 WL 1246144, at *3 (D. Ariz. Mar. 26, 2014). Nor is a movant prejudiced by not responding to facts falling into the second category because disputed facts serve to *defeat* the motion for summary judgment. Defendant in its unauthorized response disputes a number of Plaintiff's supplemental facts; if just one of these facts is material to deciding the motion, then Defendant has necessarily defeated its own motion. Thus, Defendant can gain nothing by disputing these facts. Finally, a movant is not prejudiced by not responding to facts falling into the third category because the movant's agreement that these supplemental facts are undisputed merely further supports the non-movant's position.

Defendant's final argument is that in *B2B CFO Partners, LLC v. Kaufman*, 856 F. Supp. 2d 1084 (D. Ariz. Mar. 5, 2012), the Court approved the movant's filing of a response to the non-movant's supplemental statement of facts. (Doc. 108 at 3). In *B2B*, the Court noted that it had historically handled voluminous supplemental statements of fact by permitting an extended page limit for the movant's reply. 856 F. Supp. 2d at 1087. However, the Court also noted that although the movant's filing violated the Local Rules, the "limited amount of time available before this case is scheduled to go to trial" precluded the Court from striking the movant's responsive statement of facts and permitting an extended-length reply. *Id.* The Court "reluctantly" allowed the improper

1    filing. *Id.* Thus, the Court limited its ruling in *B2B* to the peculiar facts of that case. More

2    significantly, in the present case, Defendant asked for and received a five-page extension

3    of the page limits for its reply. *See* (Doc. 106). Therefore, Defendant cannot complain

4    that it lacked an opportunity to address Plaintiff's supplemental facts.

5        Because Defendant's response to Plaintiff's supplemental statements of fact is

6    procedurally improper, the Court will grant Plaintiff's motion to strike.

7    **II.    Motion for Summary Judgment**

8        **A.    Background[1]**

9        In 2004, Plaintiff began working for a company named Manguistics, which sold

10   supply chain software. (Doc. 96 ¶ 171). Defendant is in the business of developing and

11   selling supply chain management and merchandising software, and acquired Manguistics

12   in 2006. (*Id.* ¶¶ 2, 3). Defendant employed Plaintiff as a Major Account Manager

13   ("MAM") from the time it acquired Manguistics through Plaintiff's last employed date of

14   January 7, 2013. (*Id.* ¶¶ 4, 5).

15       MAMs such as Plaintiff were responsible for selling Defendant's software to a

16   target list of existing and prospective customers. (*Id.* ¶ 5). Defendant assigned both

17   accounts (customers) and opportunities (specific targeted sales to an account) to MAMs,

18   with sales efforts being based on opportunities. (*Id.* ¶ 7; Doc. 91-2 at 14). MAMs worked

19   their opportunities until either sealing the deal or the customer made a decision to

20   purchase a competitor's product. (Doc. 96 ¶ 7). Defendant did not reassign opportunities

21   unless a MAM was terminated for performance issues. (Doc. 96-3 at 93). However,

22   MAMs did not "own" their accounts in the same way as they did opportunities;

23   periodically, Defendant reassigned accounts among MAMs, often quarterly or annually.

24   (Doc. 91-2 at 14). Nonetheless, while a MAM was assigned a particular account, he or

25   she would be assigned all new opportunities arising from that account. (Doc. 96-4 at

26   120).

27   
28   

_____

[1] The Court has construed any disputed facts in the light most favorable to
Plaintiff. *See Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

Defendant uses a service called SalesForce.com to track accounts and opportunities assigned to a MAM. (Doc. 96 ¶ 8). Within SalesForce.com, MAMs track their opportunities, their anticipated sale prices, and indicate the progression (or lack thereof) of an opportunity to a deal by assigning statuses of suspect, potential, probable, firm, and closed (ranging from 20% to 100%). (Doc. 96-4 at 83). MAMs personally updated the data, including the status, of their opportunities in SalesForce.com. (Doc. 96 ¶ 8). Defendant compensated all MAMs according to the same compensation structure, consisting of a base salary plus sales commissions based on an annual sales quota. (Doc. 96 ¶ 9). However, each MAM had his or her own assigned sales quota. (Doc. 96-4 at 23).

In December 2010, Plaintiff informed Defendant's Senior Human Resources Manager, Debra Baker, that she was pregnant. (Doc. 96 ¶ 23). In April 2011, Plaintiff inquired with Defendant's Human Resources ("HR") department as to the details of taking leave, particularly focusing on the available combinations of sick time, vacation time, short-term disability, or Family Medical and Leave Act ("FMLA") time. (Doc. 96-6 at 111-14). No one in the HR department represented to Plaintiff that her accounts and opportunities would be reassigned during her leave, or that they would not be reassigned. (Doc. 96 ¶ 29). Plaintiff would be the first MAM to ever take pregnancy leave. (Doc. 96-3 at 169-70).

On February 23, 2011, Plaintiff met with her direct supervisor, Bradley Bell, to discuss how her upcoming leave would affect her sales opportunities. (*Id.* ¶ 30). Bell told Plaintiff that she did not have to worry about losing her accounts or commissions, and that her accounts would be taken care of during her leave.[2] (Doc. 96-4 at 36). Bell also told Plaintiff that Customer Relationship Managers ("CRMs") would cover her key accounts that did not have active sales activity and Bell would cover her other accounts. (Doc. 91-5 at 14).

On March 7, 2011, Plaintiff sent an e-mail to Baker in which Plaintiff described

---

[2] Bell asserts that he never made these statements to Plaintiff. (Doc. 91-2 at 20-21).

- 4 -

Bell as having told Plaintiff that Bell would work all of her active deals while she was on leave, no other MAMs would be assigned to her opportunities or accounts, and she would receive 100% of the commissions on any deals that closed during her leave. (Doc. 96 ¶ 33). Plaintiff also told Baker that Bell said Plaintiff would receive all of her accounts back as if she "never took leave" and based on these statements, Plaintiff believed that she could take all the time needed to recover after giving birth. (*Id.*) Baker forwarded Plaintiff's e-mail to Bell to confirm whether Bell had indeed made these statements to Plaintiff. (*Id.* ¶ 34). Bell denied making these statements and said he had offered to help her active deals but had not discussed any payment of commissions with Plaintiff. (*Id.*) Plaintiff continued to request information from Defendant as to what would happen to her accounts, opportunities, and commissions during her upcoming leave, but by June 2, 2011, Defendant had not determined how Plaintiff's commissions would be handled. (Doc. 96-3 at 26).

Plaintiff gave birth on June 3, 2011, and she took eleven weeks of consecutive FMLA leave beginning on that date, until her return to work on August 22, 2011. (Doc. 96 ¶¶ 42, 60). On June 5, 2011, Plaintiff e-mailed Baker and a Michael Bridge regarding her leave, attaching a list of her assigned opportunities and stating that she had been provided with the maternity policy that allowed commissions to be "paid in full with no interruption" and that her job was protected if she returned to work within twelve weeks. (Doc. 96-6 at 56-57). Senior Vice President of Human Resources Brian Boylan replied to Plaintiff, stating that Plaintiff's interpretation of the maternity policy was incorrect. (*Id.* at 56). Boylan told Plaintiff that neither Defendant's policy nor practice provided for full payment of commissions during a leave of absence. (*Id.*) Boyland stated that although the general policy was not to pay any commission for a closed deal during leave, management would determine whether it was necessary to assign another MAM to Plaintiff's accounts during her absence. If it was not necessary to assign another MAM and the deal closed during Plaintiff's leave, Defendant would pay Plaintiff her commission for the deal. If it was necessary to assign another MAM and the deal closed

during Plaintiff's leave, Plaintiff would not receive commission for that deal. (*Id.*)

On June 28, 2011, Bell e-mailed Baker and Tim Mahoney, Group Vice President of Sales, regarding two opportunities at Discount Tire and Sears Canada that Bell had been covering during Plaintiff's absence. (Doc. 96 ¶ 47). Bell stated that after assessing the status of the deals for several weeks, and discussing with Mahoney, he and Mahoney had decided it was necessary to assign another MAM to these opportunities. (*Id.*) Bell stated that he thought he could not allocate sufficient time to give Defendant the best opportunity to close the opportunities. (*Id.*) Bell told Baker that he believed there was significant "demo prep" that needed to occur during July 2011 with respect to the Discount Tire opportunity. (*Id.* ¶ 49).

On July 6, 2011, while Plaintiff was still on leave, Bell e-mailed Plaintiff to inform her that he had decided to reassign the Discount Tire and Sears Canada opportunities to another MAM. (Doc. 96-6 at 62). Plaintiff asked if she would get the accounts back upon her return, and what the commission splits would be. (*Id.*) Bell replied that there was no commission split and that upon Plaintiff's return to work, Defendant would review those accounts and determine if they should be assigned back to Plaintiff. (*Id.* at 61). Defendant reassigned the Discount Tire opportunity to Bev Amoth, a female MAM. (Doc. 96 ¶ 64). Defendant reassigned the Sears Canada opportunity to another MAM, Bill Wortham. (Doc. 91-1 at 24-25).

Defendant did not reassign the Discount Tire or Sears Canada opportunities to Plaintiff when she returned from leave. (Doc. 96 ¶ 86). Plaintiff repeatedly requested that these opportunities be returned to her, but Defendant refused. (*Id.* ¶¶ 84, 86). The Discount Tire opportunity never resulted in a deal or commission. (*Id.* ¶ 64). Wortham ultimately closed the Sears Canada deal in the first quarter of 2012. (Doc. 96-5 at 71). While Wortham was progressing on the Sears Canada deal, Defendant reassigned the related Sears US account from Plaintiff to Wortham. (Doc. 96 ¶ 103). Wortham ultimately closed the Sears US deal in the third quarter of 2012. (*Id.* ¶ 108).

Plaintiff returned to the same compensation structure that she had prior to going

on leave. (Doc. 96-4 at 60). Plaintiff was assigned other opportunities on large accounts but Plaintiff believed these accounts were "dog" accounts unlikely to result in any deals. (*Id.*) Plaintiff's 2011 performance review noted that Plaintiff failed to reach her annual quota because of her leave. (Doc. 96-5 at 48). On February 3, 2012, Plaintiff e-mailed Mahoney and asked how she could have more "$1b plus" accounts added to her list so that she had ten named accounts and ten on her "target list." (*Id.* at 5). Plaintiff complained that she had only six named accounts and that the Sears Canada, Sears US, Restoration Hardware, and Discount Tire accounts had been removed from her list during and after her leave. (*Id.*) Plaintiff stated that she had asked for the Best Buy, American Greetings, Walmart, Canadian Tire, and Orchard Supply accounts but had been refused on all of them. (*Id.*) Plaintiff said she had received the World Kitchen account, but it was only $90 million in sales and generally "not in our range." (*Id.*)

On June 15, 2012, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), contending that Defendant had assigned accounts on a discriminatory basis due to Plaintiff's gender and pregnancy, in violation of the Equal Pay Act ("EPA"), and in retaliation against Plaintiff for taking FMLA leave. (*Id.* ¶ 117).

On August 6, 2012, Plaintiff asked Defendant to remove certain accounts that had been assigned to her in the past month because the companies were not interested in purchasing any JDA software. (Doc. 91-6 at 2). Plaintiff also asked for the MicroCenter account to be assigned to her but this account was ultimately assigned to another MAM. (*Id.*)

Plaintiff made $197,000 in sales during the first three quarters of 2012, against a quota of $3.125 million. (Doc. 96 ¶ 121). In September 2012, Defendant placed Plaintiff on a performance improvement plan, which required Plaintiff to close 50% of the opportunities that she had rated as "potential" and "probable" by the end of the first quarter of 2013. (*Id.* ¶ 121). In late 2012, Defendant acquired a competitor and terminated a number of employees as a result. Ten MAMs, six of whom were based in the United

States, were terminated. (*Id.* ¶ 126). Plaintiff was one of the terminated MAMs. (*Id.*) On January 4, 2013, Defendant notified Plaintiff that her employment was being terminated. (*Id.* ¶ 129). Plaintiff then brought this lawsuit.

### B.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment

context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

### C.    FMLA Interference Claim

Defendant contends that it is entitled to judgment as a matter of law on Plaintiff's claim for interference with her FMLA rights. (Doc. 90 at 11). As an initial matter, the Court notes that the parties disagree as to the extent of Plaintiff's FMLA claims against Defendant. Plaintiff believes she alleges three claims under the FMLA: interference, unlawful discrimination, and retaliation. (Doc. 100 at 13-14). Defendant asserts that Plaintiff alleges only a claim for FMLA interference. (Doc. 90 at 15).

The parties are not the first to struggle with the somewhat-unintuitive terminology of the FMLA. *See Gressett v. Cent. Ariz. Water Conservation Dist.*, CV12-00185-PHX-JAT, 2014 WL 4053404, at *9-10 (D. Ariz. Aug. 14, 2014) (explaining in detail the differences between the two types of FMLA claims, interference and retaliation). Because Plaintiff alleges that she was not restored to an equivalent position following her FMLA leave, (Doc. 6 at 6). Plaintiff alleges a claim for interference under the FMLA. Because Plaintiff alleges that she was threatened with termination following her FMLA leave and the implication is that this was in retaliation for filing her EEOC complaint, Plaintiff also alleges a claim for retaliation under the FMLA.[3] "Discrimination," however, is a descriptive term for "the factual circumstances of interference claims," and not a type of FMLA claim. *See Gressett*, 2014 WL 4053404, at *9.

### 1.    Legal Standard

"The FMLA creates two interrelated, substantive employee rights: first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001). Any eligible employee who takes FMLA leave is "entitled, on return from such leave . . . to be restored by the employer to the position of employment held by the employee when

---

[3] The Court will discuss all claims involving retaliation in Section II.E, *infra*.

the leave commenced; or . . . to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). The employee is not entitled, however, to any benefits of employment other than those "to which the employee would have been entitled had the employee not taken the leave." *Id.* § 2614(a)(3)(B).

"The right to reinstatement guaranteed by 29 U.S.C. § 2614(a)(1) is the linchpin of the entitlement theory because 'the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation that an employee will return to work after the leave ends.'" *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). "Thus, evidence that an employer failed to reinstate an employee who was out on FMLA leave to her original (or an equivalent) position establishes a prima facie denial of the employee's FMLA rights." *Id.*

To prove a claim for interference with FMLA rights, an employee must show that "(1) [s]he was eligible for the FMLA's protections, (2) [her] employer was covered by the FMLA, (3) [s]he was entitled to leave under the FMLA, (4) [s]he provided sufficient notice of [her] intent to take leave, and (5) [her] employer denied [her] FMLA benefits to which [s]he was entitled." *Sanders*, 657 F.3d at 778 (quoting *Burnett v. LWF Inc.*, 472 F.3d 471, 477 (7th Cir. 2006)). The employer's intent is "irrelevant to a determination of liability." *Id.*

## 2. Analysis

The sole disputed issue concerning Plaintiff's FMLA interference claim is whether Defendant restored Plaintiff to the same or equivalent position following her maternity leave. Specifically, the issue is whether Defendant failed to provide Plaintiff with equivalent sales opportunities upon her return. *See* (Doc. 90 at 12). Plaintiff claims that when she returned from her leave, Defendant assigned her worthless, dormant accounts that had little or no chance for opportunities. (Doc. 100 at 11; Doc. 96-4 at 60).

Plaintiff has presented evidence that she contemporaneously complained to

Defendant that she was no longer being assigned major accounts. *See* (Doc. 96-5 at 5). Plaintiff testified at her deposition that Defendant assigned her accounts that were unlikely to produce any opportunities or sales. The Court cannot ignore this evidence, nor can it conclude on the present record whether Defendant in fact gave Plaintiff less favorable account and opportunity assignments upon her return from leave than it did to other MAMs. This requires a factfinder to review evidence on the quality of Plaintiff's accounts compared to those of other MAMs as well as the process for assigning accounts to various MAMs. Thus, Plaintiff has shown the existence of a genuine issue of material fact as to whether the accounts assigned to Plaintiff were less favorable than those assigned to other MAMs.[4]

Defendant argues that Plaintiff was not entitled to have the Discount Tire or Sears Canada opportunities assigned to her and she had no guarantee that she would retain specific accounts. (Doc. 90 at 12-13; Doc. 107 at 4). But Plaintiff's evidence addresses the issue that her post-leave assignments were less favorable than those of other MAMs; thus, even assuming Defendant could show that as a matter of law Plaintiff was not entitled to retain Discount Tire and Sears Canada, this does not defeat the genuine issue of material fact as to whether Defendant assigned substandard accounts to Plaintiff upon her return from leave.

Defendant also points out that despite Plaintiff's complaints concerning the poor quality of her accounts, she represented during a job search that she had a valuable sales pipeline of $6 million. (Doc. 90 at 14). Plaintiff sought employment with other companies prior to her termination from Defendant, and during one interview, Plaintiff

---

[4] At oral argument, both parties discussed *McArdle v. Dell Products, L.P.*, 293 F. App'x 331 (5th Cir. 2008), in which the plaintiff was a commissioned sales representative who took FMLA leave. During the plaintiff's leave, the employer reassigned the plaintiff's accounts to other representatives; upon the plaintiff's return, the employer returned all of the accounts except one. 293 F. App'x at 333. The court held that a genuine issue of material fact existed as to whether the missing account diminished the plaintiff's future compensation because the plaintiff had averred that the account in question had historically provided him with $12,000 to $20,000 in bonuses each year. *Id.* at 335-36. Thus, *McArdle* further supports the Court's conclusion that a genuine issue of material fact exists as to whether the accounts assigned to Plaintiff were less favorable than those assigned to other MAMs.

said that she expected to complete sales of $2.4 to $3.3 million in 2012.[5] (Doc. 96 ¶ 136). But Plaintiff's statements show only that she either expected those sales or lied about having those sales; they are not authoritative on the issue of whether Defendant assigned substandard accounts to Plaintiff.

Finally, Defendant relies on *Breeden v. Novartis Pharmceuticals Corp.*, 646 F.3d 43 (D.C. Cir. 2011) for the proposition that an employer's reassignment of sales accounts during FMLA leave does not establish that the employee was not restored to her prior position. (Doc. 90 at 15). In *Breeden*, the employer reassigned its sales accounts after the plaintiff had notified the employer of her upcoming leave but before the leave. 646 F.3d at 46. The plaintiff returned from maternity leave to "the same title, same salary, same benefits, and significantly, the same accounts." *Id.* at 47. Prior to the reassignment, the plaintiff had been one of the poorest performing salespeople; however, she afterwards excelled with a substantial increase in sales and commissions. *Id.* at 45-46. The court rejected the plaintiff's complaints regarding the details of her post-reassignment accounts, finding that they focused "on precisely the sorts of de minimis, intangible, and unmeasurable aspect of a job" specifically excluded under the FMLA regulations. *Id.* at 52. In the present case, Plaintiff alleges that the post-leave assignment of accounts materially affected her job performance and her commissions. *Breeden* is not helpful here.

For these reasons, Plaintiff has shown that a genuine issue of material fact exists as to whether she was restored to the same or equivalent position following her FMLA leave.[6] Accordingly, Defendant is not entitled to summary judgment on Plaintiff's claim for interference with her FMLA rights.[7]

---

[5] The Court overrules Plaintiff's relevance objection, which is not well-founded at the summary judgment stage. *See Quanta Indem. Co.*, 2014 WL 1246144, at *3.

[6] The Court need not address Defendant's argument concerning male MAMs who allegedly took leaves of absence because even if Plaintiff's allegations were false, this would not entitle Defendant to summary judgment on this claim. *See* (Doc. 90 at 15).

[7] The Court will address Plaintiff's FMLA retaliation claim with Plaintiff's other retaliation claims.

### D.      Title VII Sex Discrimination

Defendant argues that it is entitled to summary judgment on Plaintiff's claim for sex discrimination under Title VII. (Doc. 90 at 16).

#### 1.      Legal Standard

"Title VII of the Civil Rights Act of 1964 forbids a covered employer to 'discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . sex.'" *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1344 (2015). Discrimination on the basis of sex includes discrimination on the basis of "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). A plaintiff may prove a Title VII claim in one of two ways: First, she may produce "direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008). Alternatively, and more commonly, the Court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff "must first establish a prima facie case of discrimination or retaliation." *Surrell*, 518 F.3d at 1105. This requires showing that "(1) [s]he belongs to a protected class; (2) [s]he was qualified for the position; (3) [s]he was subject to an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 11125, 1123 (9th Cir. 2000). A plaintiff may alternatively satisfy the fourth element of the prima facie case by showing that her position was filled by someone outside of her protected class. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002).

"If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory or retaliatory conduct." *Surrell*, 518 F.3d at 1106. If the defendant does so, then there is no presumption of discrimination and the plaintiff may defeat summary judgment by showing that the defendant's "proffered nondiscriminatory reason is merely

a pretext for discrimination." *Id.* (quoting *Dominguez-Curry v. Nev. Trans. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005)). In the context of pregnancy discrimination, the Supreme Court has held that a plaintiff may show pretext "by providing sufficient evidence that the [defendant]'s policies impose a significant burden on pregnant workers, and that the [defendant's] 'legitimate, nondiscriminatory' reasons are not sufficiently strong to justify the burden, but rather—when considered along with the burden imposed—give rise to an inference of intentional discrimination." *Young*, 135 S. Ct. at 1354.

### 2.    Analysis

Plaintiff contends that she has shown direct evidence of "discriminatory animus," and cites, without explanation, fifty-eight paragraphs from her controverting statement of facts. (Doc. 100 at 18). The Court has reviewed each of these paragraphs and finds nothing showing direct evidence of a discriminatory motive on the part of Defendant. The sole piece of evidence that could remotely support Plaintiff's argument is a comment by Defendant's executive vice-president of worldwide sales and marketing; upon learning that Plaintiff was going to take maternity leave, he asked Plaintiff whether she would be returning to work afterward. (Doc. 96 ¶ 221). But this statement does not, standing alone, constitute direct (or even indirect) evidence of discriminatory motives on the part of Defendant.

More significantly, the parties dispute whether Plaintiff has established a prima facie case of discrimination under the *McDonnell Douglas* burden-shifting framework. (Doc. 90 at 17; Doc. 100 at 18). Defendant does not dispute that Plaintiff belonged to a protected class or was subject to an adverse employment action. However, Defendant asserts that Plaintiff underperformed in her job and Plaintiff cannot show that similarly situated non-pregnant employees were treated more favorably than her. (Doc. 90 at 17). Plaintiff argues that non-pregnant employees were treated more favorably, and argues that she has established a prima facie case because Defendant reassigned her accounts to non-pregnant employees. (Doc. 100 at 18).

The Court finds Plaintiff has established a prima facie case of discrimination on the basis of sex. Although Defendant points out that Plaintiff had not met her annual sales quota for 2012 and the several preceding years, (Doc. 90 at 17), Plaintiff offered evidence that employees were not disciplined for failing to meet their quotas. For example, Plaintiff was recognized and congratulated as a top revenue producer in 2010 despite failing to reach her quota, and that year only two out of fifteen or sixteen MAMs in her group achieved their quota. (Doc. 96-6 at 83). Quotas were increased each year regardless of prior performance, and not all employees who failed to make quota were placed on a performance improvement plan. (Doc. 96-3 at 166; Doc. 96-5 at 84). Furthermore, Defendant transferred each of Plaintiff's reassigned accounts to a non-pregnant employee (either Amoth or Wortham). Under *Villiarimo*, this is sufficient to satisfy the fourth element of the prima facie case. 281 F.3d at 1062. Accordingly, Plaintiff has stated a prima facie case of sex discrimination.[8]

The burden now shifts to Defendant to "articulate a legitimate, nondiscriminatory reason" for its actions. *Surrell*, 518 F.3d at 1106. Defendant contends that it had to reassign the Sears Canada and Discount Tire opportunities to other MAMs because significant work needed to be done on these accounts during Plaintiff's absence. (Doc. 96 ¶ 55). Defendant contends that it did not reassign Discount Tire to Plaintiff because that opportunity was dead by the time she returned from leave. (Doc. 91 ¶ 67). Regarding Sears Canada, Defendant asserts that by the time Plaintiff returned from leave, Wortham had developed significant relationships with Sears Canada's decision makers and the process had reached a point where changing MAMs would have jeopardized Defendant's ability to close the deal. (*Id.* ¶¶ 78-81). Defendant also asserts that with respect to the new accounts assigned to Plaintiff after her return, it had embarked on a plan to review

---

[8] One item of evidence submitted by Plaintiff is a chart that shows the earnings of male and female employees of Defendant. (Doc. 96-5 at 55). Because this chart does not show any details such as job titles or compensation structure, and individual employee earnings are partially a function of sales aptitude, it is not probative on the issue of discrimination. A jury could not reliably conclude from the chart that Defendant favored male employees.

dormant accounts and distribute them to all of the MAMs in an effort to reenergize them; therefore, it did not single out Plaintiff to receive "dog" accounts. (Doc. 91-3 at 6-7). Defendant has articulated legitimate, nondiscriminatory reasons for its actions.

Accordingly, Plaintiff must show that Defendant's proffered reasons are a pretext for discrimination. Plaintiff complains that Defendant reassigned the Sears Canada and Sears US accounts to a male MAM (Wortham), but her argument omits the fact that Defendant reassigned Discount Tire to a female MAM (Amoth). Plaintiff points to no other evidence that tends to show that Defendant's proffered reasons are a pretext for discrimination. Plaintiff argues that it was not necessary to reassign these accounts and Plaintiff could have closed Sears Canada and Sears US at least as quickly as Wortham did, (Doc. 100 at 19), but this argument misses the mark. Plaintiff is not entitled to dissect Defendant's business decisions to examine, with the benefit of hindsight, whether they were optimal. Rather, Plaintiff must show that Defendant's concerns about not jeopardizing its ability to close these deals were pretext for *discrimination*. Plaintiff has not pointed to any such evidence, and as such, has not shown that a genuine issue of material fact exists on the claim of discrimination on the basis of sex. Accordingly, the Court will grant summary judgment on this claim for Defendant.

**E.    Retaliation**

Plaintiff states two claims for retaliation. First, as the Court has mentioned in its discussion of the FMLA, Plaintiff claims for retaliation under the FMLA. Second, Plaintiff claims for retaliation under Title VII. (Doc. 6 at 8-9). Because the legal standards for retaliation claims under both statutes are substantially similar, the Court will address them together.

**1.    Legal Standard**

The FMLA protects an employee against retaliatory action for asserting her FMLA rights, and provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. § 2615(a)(2). The Ninth Circuit Court of Appeals

("Ninth Circuit") has implicitly, but not explicitly, concluded that the *McDonnell Douglas* burden-shifting framework applies to FMLA retaliation claims. *See Sanders*, 657 F.3d at 777 (noting the use of the *McDonnell Douglas* framework in FMLA retaliation claims). Other district courts within the Ninth Circuit have since adopted the burden-shifting framework in FMLA retaliation cases. *See Kelleher v. Fred Meyer Stores, Inc.*, 302 F.R.D. 596, 598 (E.D. Wa. 2014); *Bushfield v. Donahoe*, 912 F. Supp. 2d 944, 953 (D. Idaho 2012).

Thus, Plaintiff must establish a prima facie case of FMLA retaliation by showing that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *Kelleher*, 302 F.R.D. at 598. If Plaintiff establishes a prima facie case, "the burden then shifts to the defendant to articulate 'a legitimate, nondiscriminatory reason for the adverse employment action.'" *Sanders*, 657 F.3d at 777 n.3. "If the employer articulates a legitimate reason for its action, the plaintiff must then show that the reason given is pretextual." *Id.*

As with the FMLA, Title VII also protects an employee from retaliation for asserting her rights. Title VII provides that it is unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A claim for retaliation under Title VII involves the same application of the *McDonnell Douglas* burden-shifting framework as does a claim for retaliation under the FMLA. *See Villiarimo*, 281 F.3d at 1064 (applying same three-step framework). However, the Supreme Court has recently held that the third element of the prima facie case for Title VII retaliation (and by extension, FMLA retaliation) requires a showing of but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

1

2.      **Analysis**

2        Defendant argues that Plaintiff cannot state a prima facie case of retaliation. (Doc.

3    90 at 20). With respect to the first prong of the prima facie case, Defendant admits only

4    that Plaintiff's filing of an EEOC charge was a protected activity, (Doc. 90 at 20), while

5    Plaintiff asserts that her internal, informal complaints to supervisors were also protected

6    activities, (Doc. 100 at 20). The Ninth Circuit has held informal complaints to constitute

7    protected activity. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212

8    F.3d 493, 506 (9th Cir. 2000). Thus, Plaintiff's actions in complaining to Defendant

9    about the reassignment of her accounts constituted protected activity because Plaintiff's

10   complaints related to Defendant's alleged discriminatory action (the reassignment of her

11   accounts). (Doc. 96-3 at 104-07).

12       Plaintiff also suffered adverse employment actions when she was placed on the

13   performance improvement plan and terminated. In the context of a retaliation claim, an

14   adverse employment action is any action that a reasonable employee would have found to

15   be materially adverse, meaning "it might have dissuaded a reasonable worker from

16   making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v.*

17   *White*, 548 U.S. 53, 68 (2006). Plaintiff's placement on the performance improvement

18   plan (and her termination) might have dissuaded a reasonable employee from making a

19   charge of discrimination.

20       With respect to causation, Plaintiff presents no direct evidence that her complaints

21   or filing of the EEOC charge were the but-for cause of an adverse employment action.

22   However, she alleges that she was placed on a performance improvement plan two

23   months after filing her EEOC charge. (Doc. 100 at 21). This raises the issue as to whether

24   temporal proximity alone can support a causal link between a protected activity and an

25   adverse employment action. The Ninth Circuit has previously held that such a causal link

26   can be inferred from temporal proximity alone. *See Thomas v. City of Beaverton*, 379

27   F.3d 802, 812 (9th Cir. 2004). Subsequent to that decision, however, the Supreme Court

28   decided *Nassar*, which rejected the previous motivating-factor test for causality in favor

of the more demanding but-for test. *Nassar*, 133 S. Ct. at 2534. Post-*Nassar*, the Court has held that proximity in time combined with knowledge of the protected activity is insufficient for the Court to "find a disputed issue of fact on causation." *Drottz v. Park Electrochemical Corp.*, 2013 WL 6157858, *15 (D. Ariz. Nov. 25, 2013).

Therefore, Plaintiff must show that either her informal complaints or her filing of the EEOC charge was the but-for cause of one of Defendant's adverse employment actions, which include her placement on the performance improvement plan, the reassignment of accounts, the identity of her newly-assigned accounts, and her termination.[9] But Plaintiff's contentions rest entirely on the temporal proximity between these actions and her complaints. Plaintiff offers no evidence showing that retaliation was a motivating factor for these actions, much less their but-for cause. Accordingly, Plaintiff fails to state a prima facie case for retaliation under either Title VII or the FMLA. Defendant is entitled to summary judgment on Plaintiff's claim for retaliation under the FMLA as well as Count III of Plaintiff's Amended Complaint.[10]

### F.   Equal Pay Act

Plaintiff alleges claims against Defendant for violations of the Equal Pay Act of 1963 and the Arizona equal pay statute. Defendant contends it is entitled to summary judgment on these claims. (Doc. 90 at 22).

#### 1.   Legal Standard

##### a.   Equal Pay Act of 1963

The Equal Pay Act of 1963 (the "Equal Pay Act") provides, in relevant part:

> No employer . . . shall discriminate . . . between employees
> on the basis of sex by paying wages to employees . . . at a rate

---

[9] Plaintiff alludes for the first time in her response to Defendant's motion to an "Equal Pay Act retaliation claim." (Doc. 100 at 23). No such claim is alleged in Plaintiff's Amended Complaint, and the fact that Plaintiff's protected activity supporting her Title VII and FMLA retaliation claims could have been her opposition to a violation of the Equal Pay Act does not convert the basis for those claims into one under the Equal Pay Act.

[10] Thus, the Court need not address Defendant's contentions regarding Plaintiff's alleged failure to exhaust her administrative remedies with respect to retaliation. (Doc. 90 at 22).

less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to . . . (iii) a system which measures earnings by quantity or quality of production . . . .

29 U.S.C. § 206(d)(1). A plaintiff has the burden of establishing a prime facie case of discrimination "by showing that employees of the opposite sex were paid different wages for equal work." *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1073-74 (9th Cir. 1999). "The prima facie case is limited to a comparison of the jobs in question, and does not involve a comparison of the individuals who hold the jobs." *Id.* at 1074. A plaintiff must prove that the jobs being compared are "substantially equal." *Id.*

If a plaintiff establishes a prima facie case of discrimination, then the burden shifts to the employer to prove that the pay differential is justified under one of the statute's four exceptions. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). These exceptions are when payment is made under "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1).

### b.    Arizona equal pay statute

Arizona has enacted an equal pay law similar to that of the federal Equal Pay Act of 1963. The Arizona law is substantially similar to the federal law, and provides that an employer must pay male and female employees the same "wage rate[]" unless the wage rates are in good faith based upon "factor or factors other than sex." A.R.S. § 23-341(A).

### 2.    Analysis

Plaintiff's alleged facts do not support claims for violations of the federal or Arizona equal pay laws. Fundamentally, the Equal Pay Act requires "equal pay for equal work." *Gunther v. Wash. Cnty.*, 623 F.2d 1303, 1309 (9th Cir. 1979). The Sixth Circuit Court of Appeals ("Sixth Circuit") has reasoned that when an employer's compensation system "measures earnings by quantity or quality of production[,] . . . [t]he 'quantity' test refers to equal dollar per unit compensation rates. There is no discrimination if two

- 20 -

employees receive the same pay rate, but one receives more total compensation because he or she produces more." *Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1029 (6th Cir. 1983); *see also Jones v. St. Jude Med. S.C., Inc.*, 823 F. Supp. 2d 699, 752 (S.D. Ohio 2011).

In the present case, there is no dispute that Plaintiff received the same compensation structure as the male MAMs. Rather, Plaintiff complains that Defendant "orchestrated lower pay by removing lucrative opportunities" from Plaintiff and Defendant "controlled total compensation by assigning dormant or non-equivalent accounts to Plaintiff expecting that she put in the same hours and effort to develop opportunities and close deals which could not reasonably be expected to occur within the same timeframe as those opportunities [Defendant] transferred from Plaintiff to Mr. Wortham." (Doc. 100 at 16).

As the Sixth Circuit held in *Bence*, equal work for equal pay in a commission compensation structure requires looking to the commission rate, and not to the total commissions paid. It is clear the Equal Pay Act excepts "a system which measures earnings by quantity or quality of production" because there is no guarantee that two sales opportunities of equal potential will require the exact same quantity of work to earn a commission, and therefore no employer could ever guarantee that male and female employees will invest precisely equal quantities of work to earn an equal commission. All that the Equal Pay Act and the Arizona equal pay statute require is that Plaintiff received the same commission rate as male MAMs.

Plaintiff complains that *Bence* is not binding in the Ninth Circuit and notes that the Sixth Circuit stated its holding was a "narrow one." (Doc. 100 at 16). But the Sixth Circuit in *Bence* did not limit its holding with respect to the proper measure of compensation for commission sales; rather, the court noted that it did not hold that "an employer may not under any circumstances segregate male and female employees into separate departments and pay them different rates of wages." *Bence*, 712 F.2d at 1031. Presumably, such separate departments would have different quantities of work

commensurate with their respective wage rates. Regardless, this limitation is irrelevant to the present case.

Plaintiff also asserts that *Bence* acknowledges that total compensation may be an appropriate measure for unequal wages. (Doc. 100 at 16). But the Sixth Circuit merely remarked that in certain circumstances where employees are paid "on the basis of hours spent" or only part of their job depends upon quantity of production, total compensation may be an appropriate benchmark for equal pay. *Bence*, 712 F.2d at 1027-28. This is consistent with the situation in which an employer pays lower hourly wages or annual salary to workers of one gender than the other gender. It is inapposite where, as in the present case, compensation is tied to performance.

Plaintiff also contends that the Ninth Circuit has in one case considered total compensation as the measure of pay applicable to a salesperson, citing *Thomsen v. R Supply Co.*, 220 F. App'x 506 (9th Cir. 2007). The Ninth Circuit's unpublished opinion in *Thomsen* does not identify whether the salesperson in that case was paid on commission or on salary, and therefore the case is wholly unhelpful. The Court has not found any Ninth Circuit precedent supporting Plaintiff's total compensation theory as applied to commission-based compensation structures.

Plaintiff's complaint that Defendant reduced Plaintiff's total compensation paid by assigning her substandard accounts is an allegation supporting a claim for Title VII sex discrimination, not the Equal Pay Act. Defendant is entitled to summary judgment on Counts IV and V of Plaintiff's Amended Complaint.

## III. Conclusion

In conclusion, Defendant is entitled to summary judgment on Plaintiff's claims for retaliation under the FMLA (listed under "Count I" of Plaintiff's Amended Complaint), sex discrimination under Title VII (Count II), retaliation under Title VII (Count III), failure to pay equal wage rates under the Equal Pay Act (Count IV), and failure to pay equal wage rates under A.R.S. § 23-341 (Count V). Plaintiff's sole surviving claim is her claim for interference with her FMLA rights (listed under "Count I" of Plaintiff's

1 | Amended Complaint).

2 |     For the foregoing reasons,

3 |     **IT IS ORDERED** granting the Motion to Strike Defendant's Response to

4 | Plaintiff's Supplemental Statement of Facts and Attached Exhibits (Doc. 105).

5 |     **IT IS FURTHER ORDERED** striking Doc. 104 and Doc. 104-1.

6 |     **IT IS FURTHER ORDERED** granting in part and denying in part Defendant's

7 | Motion for Summary Judgment (Doc. 90).

8 |     Dated this 29th day of June, 2015.

James A. Teilborg
Senior United States District Judge