WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kimberly Isom,<br><br>  Plaintiff,<br><br>v.<br><br>JDA Software Incorporated,<br><br>  Defendant. | No. CV-12-02649-PHX-JAT<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

In this Family and Medical Leave Act ("FMLA") case, the jury found that Defendant JDA Software Incorporated violated the FMLA by interfering with Plaintiff Kimberly Isom's statutory rights, and awarded Plaintiff $114,618 in compensatory damages. (Doc. 171 at 1). Following the verdict, the Court instructed the parties to file proposed findings of fact and conclusions of law with respect to the issue of whether Defendant acted in good faith. (Doc. 166). The Court has considered the parties' filings, and hereby finds and concludes the following.[1]

## I.  Findings of Fact

The following findings are derived from stipulated facts, credible testimony at trial, and documentary evidence submitted into the record. Plaintiff first informed

---

[1] Defendant's proposed findings include the assertion that it "intends to renew its motion for judgment as a matter of law (or motion for judgment notwithstanding the verdict)" with respect to a $10,000 maintenance commission. (Doc. 174 at 1 n.1). As Defendant did not actually raise the issue here, the Court will not address it.

Defendant of her pregnancy and of the possibility of exercising her right to medical leave under the FMLA in December 2010. On December 30, 2010, Plaintiff emailed Debbie Baker, Defendant's Human Resources Director, and expressed that her greatest concern with respect to the pregnancy was the possibility of Defendant's sales management team "taking away any of [her] hard work over the last [two] years building a[] . . . pipeline," as certain account opportunities can "take anywhere" from a year to a year and a half to realize a sale. Plaintiff sought to ensure "that [she would be] compensated for [her] work, even if out of maternity leave," and to determine whether it was in her financial interest to take FMLA leave.

Sometime "in or around January of 2011," Plaintiff informed Brad Bell,[2] her immediate supervisor and the Vice President of Sales for the Retail Hardlines group, that she was pregnant and had been given a due date of July 3, 2011. Bell was aware that Plaintiff had "expressed her concerns" about commissions associated with accounts that she had been working on "[b]oth in telephone communications, in person[,] and in emails." By March 21, 2011, Plaintiff had yet to be informed by human resources or her management team as to how, or if she would be paid for certain accounts if she took FMLA leave. Plaintiff contacted Debbie Baker via email for an update on whether she would retain certain accounts while on FMLA leave and if she would be eligible for any kind of a commission. The following day, Plaintiff contacted Brad Bell and voiced surprise at a recent "change in direction by [Human Resources]," as well as concern as to the negative effect the change might have on her sales accounts. At this time, Plaintiff openly entertained the notion of returning from FMLA leave early, and her communications again concerned "commissions," how Defendant would "handle [her] accounts," and whether she would return to work "with [the] same accounts and [the] same earning potential."

By May 31, 2011, Plaintiff had not received information on how her "accounts

---

[2] Brad Bell became Plaintiff's direct supervisor in January 2011. Tom Jones was the prior Vice President of Sales for the Retail Hardlines group.

w[ould] be managed" while she was out. On June 2, 2011, Plaintiff contacted Michael Bridge, Defendant's in-house General Counsel at the time, to determine whether there had been "any progress on clarification" of Defendant's maternity policy. Plaintiff had not made a decision as to whether she would exercise her rights under the FMLA and was concerned that certain accounts would be taken from her. Plaintiff informed Defendant that her decision with respect to FMLA leave would be "based on the financial impact" it would have on her, and she again expressed concern over how Defendant would handle certain deals that she had invested an extended period of time in, including Sears Canada. Bridge did not know why Defendant had not contacted Plaintiff directly, but told her that "management and/or HR should be getting back to [her] to give [her] more clarity."

Plaintiff decided to take FMLA leave on June 3, 2011, when her twins were born, but was unsure as to how long she would remain on leave due to her inability to obtain substantive responses to her inquiries. On June 13, 2011, Bryan Boylan, Defendant's Vice President of Human Resources, advised Plaintiff that "[Defendant's] general policy is that a sales account manager who is on leave of absence at the time a software license deal closes shall not be entitled to any commission for that particular deal," and that Defendant would "not consider any exception to this policy" other than in "rare circumstance[s]" not applicable to Plaintiff. A determination would then be made by Defendant "as to whether it is necessary to assign another account manager to [certain] accounts during the period of [Plaintiff's] absence." Sometime after this exchange, Plaintiff called Brad Bell and left a voice mail seeking an update on her accounts.

On July 6, 2011—"a few weeks" after Plaintiff's voicemail—Bell informed Plaintiff that despite his efforts over the previous four weeks, and having "invested significant time supporting" Plaintiff's accounts, he had "no choice but to re-assign" the Sears Canada account because it was "clear . . . that there [was] still significant work to be done to bring Sears Canada . . . to closure."[3] Plaintiff inquired as to whether the account would be returned at the conclusion of her FMLA leave, and emphasized the

---

[3] Two accounts were transferred by Bell. Only one is at issue here.

significant time she spent on the account over the previous eighteen months. Bell told Plaintiff that when she returned to active work, Defendant would review the accounts that were transferred, and if the accounts were still active, "determine if they should be assigned back to [Plaintiff]." He further reaffirmed that Defendant did "not have any split commissions arrangement."

On July 14, 2011, Defendant transferred the Sears Canada account to Bill Wortham due to Plaintiff's absence on FMLA leave. Plaintiff returned to active work on August 22, 2011. The Sears Canada account remained with Wortham and Plaintiff was advised "that this decision [was] final," it was made "in accordance with [Defendant's] policy" and was "not subject to negotiation." Plaintiff did not receive any commission when Sears Canada closed on March 31, 2012.

The foregoing findings were based on stipulated facts, documentary evidence submitted into the record and credible testimony at trial from February 29, 2016, to March 9, 2016.

## II. Analysis and Conclusions of Law

### A. Liquidated Damages Under the FMLA

Under the FMLA, a successful plaintiff is presumptively entitled to an award of liquidated damages equal to the amount of employment benefits denied or lost to her by reason of the defendant's FMLA violation, including interest. Title 29 U.S.C. § 2617(a)(1)(A)(i)-(iii) (2012). However, "if an employer who has violated [the FMLA] proves to the satisfaction of the [C]ourt that the act or omission [that violated the FMLA] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of [the FMLA]," the Court may, in its discretion, reduce the amount of liability to the jury's award of lost employment benefits plus interest. 29 U.S.C. § 2617(a)(1)(A)(iii).

In determining whether a defendant acted in good faith and had reasonable grounds for believing its actions were not violative of the FMLA, a court must make

specific, explicit findings and explain its reasoning. *Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1015-16 (9th Cir. 2010). It is the "employer's burden . . . to establish that it had 'an honest intention to ascertain and follow the dictates of the Act'[4] and that it had 'reasonable grounds for believing that its conduct complied with the Act.'"[5] *Local 246 Util. Workers*, 83 F.3d at 298 (quoting *Marshall v. Brunner*, 668 F.2d 748, 753 (3d. Cir. 1982)).

Defendant argues Plaintiff is not entitled to liquidated damages because Defendant routinely consulted with Human Resources and legal counsel to ensure that it adhered to the FMLA with respect to Plaintiff's pregnancy, and that it was forced to react to Plaintiff's FMLA leave "without the benefit of any on-point statute or regulation, DOL opinion letter or other formal or informal guidance, or prior decisional law." Coupled with the fact that Plaintiff enjoyed a full eleven weeks of FMLA leave and was returned to the same position with the same base salary and commission structure, Defendant contends that it acted in good faith.

Having reviewed the record, the Court finds dispositive Plaintiff's repeated inability to obtain reasonable information from Defendant with respect to retention of certain account opportunities and her eligibility for commissions. Plaintiff first expressed concern over these issues to Defendant's Human Resources Director as early as December 30, 2010. Over the next six months, Plaintiff continued to inquire about these

---

[4] "Good faith is an honest intention to ascertain what the [FLMA] requires and to act in accordance with it."[4] *Local 246 Util. Workers Union v. S. Cal. Edison Co.*, 83 F.3d 292, 298 (9th Cir. 1996) (quoting *EEOC v. First Citizens Bank*, 758 F.2d 397, 403 (9th Cir. 1985)).

[5] *Arban v. West Publ'g Corp.*, 345 F.3d 390, 408 (6th Cir. 2003) (citation omitted) (noting that the Sixth Circuit has "turned to the Fair Labor Standards Act (FLSA) . . . for guidance in interpreting the FMLA," as "[t]he legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA"); *Singer v. City of Waco*, *Tex.*, 324 F.3d 813, 823 (5th Cir. 2003) (turning to the FLSA to interpret the remedial provisions in the FMLA).

two interlinked issues with both human resources and sales management. On more than one occasion, Plaintiff informed Defendant that the length of her FMLA leave, and whether she would take FMLA leave at all, was dependent upon the information she received in response to her inquiries, and the personal financial impact that Defendant's policies would have.

Defendant did not promulgate any written policy concerning the possible transfer of accounts or how commissions would be addressed for accounts that were ultimately transferred. Defendant contends that this is due to the fact that Plaintiff's case presented a first-time issue for Defendant; she was the first saleswoman in the company's history to take maternity leave under the FMLA, which caused Defendant to adjust as the situation unfolded. The Court acknowledges this reality, but finds it an insufficient rationale to excuse Defendant's months-long failure to provide Plaintiff with information significant to her determination of whether to exercise her statutory rights.

Additionally, beyond a failure to promulgate a written policy, Defendant never told Plaintiff of its policy regarding the aforementioned issues until ten days after she commenced FMLA leave.[6] Plaintiff learned of the at-issue policies on June 13, 2011, when she was informed by Bryan Boylan that Defendant did not award split commissions, and that "a determination w[ould] be made by management as to whether it is necessary to assign another account manager to [her] accounts during the period of [her] absence." The Court appreciates the volatile nature of national software sales,[7] but finds Defendant's policy—belatedly disclosed to Plaintiff—to be insufficiently clear and objective. Defendant's position, essentially, was that it may transfer her accounts, it may not, it would provide no timeline, it would provide no objective metrics upon which to base the determination, it would provide no opportunity for Plaintiff to return early to

---

[6] Plaintiff took leave on June 3, 2011. The fact that Plaintiff's delivery occurred one month earlier than her initial delivery date is inconsequential. Plaintiff had expressed concern over how her accounts would be managed and how commissions would be awarded as early as December 30, 2010.

[7] Brad Bell testified that Defendant's "sales cycles . . . and opportunities can change on a dime," rendering advance judgments useless.

avoid having accounts the transferred,[8] and it would not permit Plaintiff to receive any commission on the affected accounts.

Plaintiff then learned from Brad Bell that certain accounts would be transferred on July 6, 2011, "a few weeks" after inquiring as to their status. Bell had "no choice but to re-assign" Sears Canada because it became "clear over the last few weeks that there is still significant work to be done to bring Sears Canada . . . to closure." On July 8, 2011, Plaintiff was told that after she returned to work, Defendant would "review these accounts, if still active, and determine if they should be assigned back to [her]." Defendant's policy again lacks clarity and objectivity, and offered Plaintiff no control over retention of these accounts. The Court acknowledges Bell's efforts and the "significant time" he invested in Plaintiff's accounts in order to avoid the scenario that ultimately led to this litigation. But the issue is not the efforts of individual employees on an ad-hoc basis working to avoid a less-favorable outcome for an employee out on federally protected leave. Rather, the Court's concern is with Defendant's inability to proffer reasonable information in a timely manner, as well as the ultimate issuance of policies that—due to lack of clarity—gave Plaintiff no ability to retain certain accounts and forced her into a position of having to weigh statutorily protected leave against possible professional setbacks.

In sum, Plaintiff communicated to Defendant that the exercise of her rights under the FMLA was dependent upon information she received for two specific questions: (1) the possible transfer of certain accounts; and (2) her eligibility for commissions. Defendant maintained no written policy on either issue, and failed to promulgate a written policy in a timely manner when Plaintiff sought clarification seven months in advance of her due date.[9] Defendant then failed to concretely answer Plaintiff's repeated

---

[8] Although Defendant told Plaintiff that she could return at "any time," the record does not establish that Defendant gave Plaintiff any idea or timeline of when she would *need* to return in order to avoid the loss of certain sales accounts.

[9] When Plaintiff first sought this information from Defendant, her due date was July 3, 2011.

inquiries on the aforementioned issues, and forced Plaintiff to exercise her statutory rights without sufficient knowledge as to the consequences that it would entail. Finally, Defendant belatedly disseminated a policy to Plaintiff that excised certain opportunities from Plaintiff's portfolio based on internal metrics that provided no opportunity for her to terminate her FMLA leave and return to work early, as she informed Defendant she would. Defendant's policy essentially forced Plaintiff to either forego her statutory rights or guess as to the professional consequences, an untenable position that is "willfully indifferent to the FMLA" and not "in good faith."[10] *Gressett v. Cent. Ariz. Water Conservation Dist.*, No. CV-12-00185-PHX-JAT, 2015 U.S. Dist. LEXIS 42806, at *8 (D. Ariz. Mar. 31, 2015) (citation omitted).

For these reasons, the Court concludes that Defendant has not proved by a preponderance of the evidence that its actions were in good faith and that it had reasonable grounds for believing its actions did not violate the FMLA. The Court will therefore award liquidated damages for Plaintiff and against Defendant in amount authorized by 29 U.S.C. § 2617 (a)(1)(A)(iii), $114,618.

**B.  Prejudgment Interest**

"Title VII authorizes prejudgment interest as part of the . . . remedy in suits against private employers." *Loeffler v. Frank*, 486 U.S. 549, 557 (1998). Similarly, "[u]nder the FMLA, an employer 'shall be liable' for the pre-judgment interest on the amount of 'any wages, salary, employment benefits, or other compensation denied or lost to an employee by reason of the FMLA violation.'" *Eichenberger v. Falcon Air Express Inc.*, No. CV-14-00168-PHX-DGC, 2015 U.S. Dist. LEXIS 85665, at *20 (D. Ariz. July 1, 2015) (quoting

---

[10] Nothing in the Court's Order should be construed as a determination of whether certain actions by the Defendant constitute a violation of the FMLA. That issue was submitted to the jury, which returned a verdict finding that Defendant had interfered with Plaintiff's rights under the FMLA. The Court's analysis in this Order is confined entirely to a determination of whether Defendant has shown by a preponderance of the evidence that its actions were in good faith and that it had reasonable grounds to believe its actions did not violate the FMLA for the purpose of determining whether Plaintiff is entitled to liquidated damages under 29 U.S.C. § 2617 (a)(1)(A)(iii).

*Dotson v. Pfizer*, *Inc.*, 558 F.3d 284, 301 (4th Cir. 2009)). Any "award of liquidated damages under the FMLA must also include prejudgment interest." *Id.* (citing *Dotson*, 558 F.3d at 301).

The Ninth Circuit has established that "the measure of interest rates prescribed for post-judgment interest in 28 U.S.C. [§] 1961(a) is . . . appropriate for fixing the rate for pre-judgment interest in cases . . . where prejudgment interest may be awarded."[11] *W. Pac. Fisheries*, *Inc.*, 730 F.2d at 1289; *see also Van Asdale v. Int'l Game Tech*, 763 F.3d 1089, 1093 (9th Cir. 2014) (citation omitted). The Ninth Circuit has also found that this interest rate is appropriate "with respect to pre-judgment interest in Title VII back pay cases." *Price v. Stevedoring Servs. of Am.*, *Inc.*, 697 F.3d 820, 837 (9th Cir. 1984).

Accordingly, Plaintiff is entitled to prejudgment interest "calculated at the prevailing rate" set forth in 28 U.S.C. § 1961 on the $114,618 lost wages award as well as the $114,618 liquidated damages award. The Court hereby awards $872.46 in prejudgment on the lost wages award, and $872.46 in prejudgment interest on the liquidated damages award, for a total of $1,744.92.[12]

### III. Conclusion

Based on the foregoing,

**IT IS ORDERED** that Plaintiff is awarded liquidated damages in the amount of $114,618 pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), bringing the total damages award for Plaintiff and against Defendant to $229,236.

**IT IS FURTHER ORDERED** that Plaintiff is entitled to $872.46 in prejudgment

---

[11] "Substantial evidence" establishing that "the equities of th[is] particular case require a different rate" does not exist in this case. *W. Pac. Fisheries*, *Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir. 2012).

[12] Plaintiff's proposing findings included a calculation of prejudgment interest on Plaintiff's damages that total $872.46 calculated over a four-year period at the rate of .019% per annum. Defendant has not objected to this calculation and the Court, having reviewed 28 U.S.C. § 1961 and applicable authorities, believes the calculation to be correct. Accordingly, the Court accepts Plaintiff's proposed calculation of prejudgment interest.

1  interest on the lost wages award, and $872.46 in prejudgment interest on the liquidated
2  damages award, for a total of $1,744.92.
3       **IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter
4  judgment in favor of Plaintiff and against Defendant in the amount of $230,980.92, with
5  post-judgment interest to accrue at the applicable federal rate.
6       Dated this 31st day of March, 2016.

James A. Teilborg
Senior United States District Judge